IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JACKSON FURNITURE INDUSTRIES, INC., | ) | |
| JACKSON FURNITURE INDUSTRIES, INC. | ) | |
| d/b/a CLEVELAND CHAIR COMPANY, | ) | |
| JACKSON FURNITURE INDUSTRIES, INC. | ) | |
| d/b/a JACKSON FURNITURE, | ) | |
| JACKSON FURNITURE INDUSTRIES, INC. | ) | |
| d/b/a CATNAPPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO_____ |
| HICKORY SPRINGS MANUFACTURING | ) | JURY TRIAL DEMANDED |
| COMPANY, | ) | |
| VALLE FOAM INDUSTRIES, INC., | ) | |
| DOMFOAM INTERNATIONAL, INC. | ) | |
| THE CARPENTER COMPANY, | ) | |
| FLEXIBLE FOAM PRODUCTS, INC., | ) | |
| SCOTTDEL INC., | ) | |
| FXI-FOAMEX INNOVATIONS, INC., | ) | |
| FUTURE FOAM, INC., | ) | |
| VITAFOAM PRODUCTS CANADA LIMITED, | ) | |
| VITAFOAM, INC., | ) | |
| BRITISH VITA UNLIMITED, | ) | |
| MOHAWK INDUSTRIES, INC., | ) | |
| LEGGETT & PLATT, INC., | ) | |
| E.R. CARPENTER, L.P. (F/K/A CARPENTER | ) | |
| CHEMICAL, L.P.), | ) | |
| CARPENTER HOLDINGS, INC., | ) | |
| WOODBRIDGE SALES & ENGINEERING, INC., | ) | |
| WOODBRIDGE FOAM FABRICATING, INC. | ) | |
| WOODBRIDGE FOAM CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

1

<u>COMPLAINT</u>

Plaintiff, Jackson Furniture Industries, Inc., Jackson Furniture Industries, Inc. d/b/a Cleveland Chair Company, Jackson Furniture Industries, Inc. d/b/a Jackson Furniture, and Jackson Furniture Industries, Inc. d/b/a Catnapper (collectively, "Plaintiff") brings this action against defendants Hickory Springs Manufacturing Company, Valle Foam Industries, Inc., Domfoam International, Inc. The Carpenter Company, Flexible Foam Products, Inc., Scottdel Inc., FXI-Foamex Innovations, Inc. Future Foam, Inc., Vitafoam Products Canada Limited, Vitafoam, Inc., British Vita Unlimited, Mohawk Industries, Inc., Leggett & Platt, Inc., E.R. Carpenter, L.P. f/k/a Carpenter Chemical, L.P., Carpenter Holdings, Inc., Woodbridge Sales & Engineering, Inc., Woodbridge Foam Fabricating, Inc., and Woodbridge Foam Corporation, (collectively, "Defendants") for damages and injunctive relief under the antitrust laws of the United States specifically, Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 1.  Plaintiff also seeks relief and damages under state law for violations of Tennessee Code §§ 47-25-101 et seq.,

Plaintiff respectfully demands a trial by jury, and complaints and alleges as follows:

NATURE OF THE ACTION

1.      Between at least as early as January 1, 1999 and the present, Defendants have combined, conspired and agreed to fix, inflate and maintain prices for flexible, polyurethane foam ("foam") and have agreed not to solicit one another's customers for said product. Each of these activities constitute a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C.§1 as well as a violation of Tennessee Code §§ 47-25-101 et seq. The allegations in this Complaint are based on the investigation of counsel, records of governmental investigations, economic analysis of

2

performed at the request of other, similarly situated companies and, where indicated, information and belief.

2. As a result of the conspiracy among Defendants and their co-conspirators, the price of foam has been higher than it would have been absent such conspiracy.

3. Prior to Hurricane Katrina in September 2005, the primary effect of the conspiracy was to maintain stable foam prices despite declining materials costs that would otherwise have caused price reductions. After Hurricane Katrina, however, the damages caused by the conspiracy increased dramatically. For a short time in late 2005, the disruption caused by Hurricane Katrina slowed the production of Toluene Diisocyanate ("TDI"), one of the chemicals used to make foam. The conspirators used this shortage, and the resulting short-term increase in TDI prices, to justify enormous increases in the price of foam and to maintain these escalated prices even after TDI production had normalized and foam demand had decreased. The aforementioned economic analysis indicated that during the post-Katrina years, foam prices were at least 15.2% higher than they would have been absent a conspiracy.

Aside from the economic indications discussed above, substantial evidence of the price-fixing conspiracy has been gathered in the course of the investigation conducted by the United States Department of Justice ("DOJ") into anti-trust violations in the polyurethane foam market. This evidence includes direct evidence of specific communications between the management employees of the Defendants in which they entered into agreements to fix prices or otherwise manipulate the polyurethane foam marketplace.

4. Further, upon information and belief, in or around February 2010, Defendant Vitafoam voluntarily approached the DOJ Antitrust Division in order to report antitrust violations in the polyurethane foam industry and to seek acceptance into the DOJ's Corporate Leniency Program. Since that time, Vitafoam and its employees have been cooperating with the criminal

3

investigation and in the civil efforts undertaken by injured foam purchasers to recover their damages.

5.      The payment of supra-competitive prices by Plaintiff constitutes antitrust injury of the type that the federal laws were meant to punish and prevent.  Plaintiff files this lawsuit seeking recovery of its damages, plus applicable statutory penalties, including the trebling of damages pursuant to Federal Law and other damages pursuant to applicable state law.

JURISDICTION

6.      Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15 and §26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by reason of the violations of Section 1 of the Sherman Act, 15 U.S.C. §1, as alleged herein.

7.      In addition, Plaintiff institutes this action to secure injunctive relief against Defendants to prevent them from further violating Section 1 of the Sherman Act as alleged in this Complaint Absent injunctive relief, the agreements and industry structure alleged herein will continue to violate or threaten violations of U.S. antitrust laws.

8.      This Court has subject matter jurisdiction of this case under 28 U.S.C. § 1331 and §1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and §26.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 USC § 1367.

10.     Venue is proper in this Judicial District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §15, §22 and §26, and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint, Defendants transacted business, were found, or acted through subsidiaries or agents present in this District.  Additionally, a substantial part of the interstate commerce involved and affected by the alleged violations of the antitrust laws was and is carried

4

on in part within this District. The acts complained of have had substantial anticompetitive effects within this District.

11.     The Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this District and directed the unlawful conspiracy through persons and entities located in this District, including fixing the prices of polyurethane foam sold to purchasers in this District; (b) transacted business in polyurethane foam and other products in this District; (c) maintains and has maintained continuous and systematic contacts with this District over a period of years; and (d) purposefully availed itself of the benefits of doing business in this District. Accordingly, each of the Defendants maintains minimum contacts with this District more than sufficient to subject it to service of process and sufficient to comply with due process of law.


PLAINTIFF

12.     Plaintiff Jackson Furniture Industries, Inc. ("Jackson Furniture") is a Tennessee corporation with its principal place of business at 1910 King Edward Avenue, Cleveland, Tennessee 37311. Jackson Furniture purchased flexible polyurethane foam directly and indirectly from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

13.     Plaintiff Jackson Furniture Industries, Inc. d/b/a Cleveland Chair Company ("Cleveland Chair") is a Tennessee corporation with its principal place of business at 1910 King Edward Avenue, Cleveland, Tennessee 37311. Cleveland Chair purchased flexible polyurethane foam directly and indirectly from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

5

14.     Plaintiff Jackson Furniture Industries, Inc. d/b/a Jackson Furniture ("Jackson") is a Tennessee corporation with its principal place of business at 1910 King Edward Avenue, Cleveland, Tennessee 37311. Jackson purchased flexible polyurethane foam directly and indirectly from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

15.     Plaintiff Jackson Furniture Industries, Inc. d/b/a Catnapper ("Catnapper") is a Tennessee corporation with its principal place of business at 1910 King Edward Avenue, Cleveland, Tennessee 37311. Jackson purchased flexible polyurethane foam directly and indirectly from one or more of the Defendants or their co-conspirators and has suffered pecuniary injury as a result of the antitrust allegations alleged herein.

DEFENDANTS

**Hickory Springs**

16.     Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue Northwest, Hickory, North Carolina 28601. During the relevant period, Hickory Springs manufactured and sold polyurethane foam for bedding, furniture, carpet, automotive and other applications. During time periods relevant to the allegations in this Complaint, Hickory Springs manufactured and sold polyurethane foam including polyurethane foam that was purchased by the Plaintiff. Hickory Springs engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Tennessee Code §§ 47-25-101 et seq.

**Carpenter**

17.     Defendant, Carpenter Co. ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond, Virginia 23230. Carpenter is the parent of domestic Carpenter entities, including Carpenter ER (defined below) and Carpenter

6

Holdings (defined below). Carpenter USA is also the parent or other affiliate of foreign Carpenter entities who manufacture and/or sell polyurethane foam, including Carpenter Canada Co. ("Carpenter Canada"), which is a Canadian corporation with its principal place of business in Woodbridge, Ontario, Canada: Carpenter-Dumo NV (Belgium); Carpenter APS (Denmark); Carpenter S.A. (France); Carpenter GmbH (Germany); Carpenter Sweden AB (Sweden); and Carpenter PLC (United Kingdom). Carpenter USA characterizes itself as the largest producer of comfort cushioning products, including flexible polyurethane foam, in the world. During time periods relevant to the allegations in this Complaint, Carpenter USA directly and/or through Carpenter ER and/or Carpenter Holdings manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section of the Sherman Act, 15 U.S.C. § 1 and Tennessee Code §§ 47-25-101 et seq.

18. Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("Carpenter ER") is a Virginia limited partnership with its principal place of business in Richmond, Virginia. During time periods relevant to the allegations in this Complaint, Carpenter USA directly and/or through Carpenter ER and/or Carpenter Holdings manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section of the Sherman Act, 15 U.S.C. § 1 and Tennessee Code §§ 47-25-101 et seq.

19. Defendant Carpenter Holdings, Inc. ("Carpenter Holdings") is Virginia corporation with its principal place of business in Richmond, Virginia. During time periods relevant to the allegations in this Complaint, Carpenter USA directly and/or through Carpenter ER and/or Carpenter Holdings manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per

7

se violation of Section of the Sherman Act, 15 U.S.C. § 1 and Tennessee Code §§ 47-25-101 et seq.

20.     Carpenter USA, Carpenter ER, Carpenter Holding and/or Carpenter Canada were each members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officer, employees and representatives.

21.     Carpenter USA, Carpenter ER, and Carpenter Holdings are individually and collectively referred to in this Complaint as "Carpenter" or the "Carpenter Defendants".

22.     During time periods relevant to these allegations, Carpenter manufactured and/or sold polyurethane foam for bedding, furniture, carpet, automotive, and other applications.

**Flexible Foam**

23.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 with operations in Texas, Indiana, Florida, and Wisconsin.  Flexible Foam is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  During the time periods relevant to the allegations in this Complaint, Flexible Foam directly and/or through or on behalf of Ohio Decorative Products manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section of the Sherman Act, 15 U.S.C § 1 and Tennessee Code §§ 47-25-101 et seq.

24.     During time periods relevant to these allegations, Flexible Foam manufactured and/or sold polyurethane foam for bedding, furniture, carpet, automotive, and other applications.

**Foamex**

25.     Defendant, FXI-Foamex Innovations, Inc. ("Foamex USA"), f/k/a Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters

8

located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania, 19063. Upon information and belief, Foamex USA acquired the assets and liabilities of Foamex International, Inc., Foamex L/O., BFF Foam Corp., and 2422735 Canada Inc. (f/k/a Foamex Canada Inc.) ("Foamex Canada"), including liabilities arising from or related to the antitrust violations alleged in this complaint. During time periods relevant to these allegations, including (but not limited to) after June 2009 and/or after Foamex USA acquired the assets of the companies identified in the immediately preceding sentence, Foamex USA manufactured and/or sold polyurethane foam purchased by Plaintiff and others in the United States; Foamex USA continued in the conspiracy alleged in this Complaint or joined in the conspiracy after it was underway with knowledge of what had gone on before and with an intent to pursue the same objectives as its co-conspirators of not competing on the sale of polyurethane foam sold in the United States and elsewhere; and otherwise engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq. Furthermore, during time periods relevant to the allegations in this Complaint, Foamex USA directly and/or through Foamex International, Inc., Foamex L.P., BFF Foam Corp. or Foamex Canada manufactured and/or directly sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

26. Before Foamex USA acquired Foamex International, Inc. and Foamex L.P. and during time periods relevant to these allegations, Foamex L.P. itself and/or on behalf of Foamex International, Inc. manufactured and/or directly sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this

Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

27.     Before Foamex USA acquired BFF Foam Corp. and Foamex Canada, and during time periods relevant to these allegations, BFF Foam Corp. and Foamex Canada manufactured and/or directly sold polyurethane foam; BFF Foam Corp. And/or Foamex Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and BFF Foam Corp. and Foamex Canada engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

28.     (a)     Before Foamex USA acquired Foamex International, Inc. Foamex L.P., BFF Foam Corp. and Foamex Canada, each of those entities were members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

(b)     Alternatively, before Foamex USA acquired them, BFF Foam Corp. and Foamex Canada were each a member of the conspiracy alleged in this Complaint because of, among other reasons, and upon information and belief, their respective status during time periods relevant to these allegations as the alter ego or agent of Foamex International, Inc. and/or Foamex L.P. as evidenced by, among other things, Foamex International, Inc.'s and/or Foamex L.P.'s domination or control over BFF Foam Corp. and/or Foamex Canada with respect to one or more of the following: (i) the prices at which BFF Foam Corp. and/or Foamex Canada sold polyurethane foam; (ii) the hiring and firing of officers or members of the Board of Directors of BFF Foam Corp. and/or Foamex Canada; (iii) the budgets for BFF Foam Corp. and/or Foamex Canada; (iv) the capitalization of and/or loans to BFF Foam Corp. and/or Foamex Canada; (v) the transfer of

10

officers or employees between BFF Foam Corp. and/or Foamex Canada and Foamex International, Inc. and/or Foamex L.P.; (vi) financial benefits provided to officers or employees of BFF Foam Corp. and/or Foamex Canada; (vii) the business plan or operation of BFF Foam Corp. and/or Foamex Canada; (viii) officers or employees of Foamex International, Inc. and/or Foamex L.P. communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of BFF Foam Corp. and/or Foamex Canada; (ix) Foamex International, Inc. and/or Foamex L.P. used BFF Foam Corp. and/or Foamex Canada as its/their instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere which Foamex International, Inc. and/or Foamex L.P. used to charge Plaintiff and/or others supracompetitive prices for polyurethane form; and/or (x) Foamex International, Inc. or Foamex L.P. and BFF Foam Corp. or Foamex Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias and other marks. Foamex International, Inc. and/or Foamex L.P. dominated or controlled BFF Foam Corp. and/or Foamex Canada with respect to conspiracy activities alleged in this Complaint.

29.     FXI-Foamex International, Inc., Foamex International, Inc. Foamex L.P., Foamex Canada and BFF Foam Corp. are individually and collectively referred to as "Foamex" or the "Foamex Defendants".

30.     During the time periods relevant to these allegations, Foamex manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications.

**Future Foam**

31.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located at 1610 Avenue N, Council Bluffs, Iowa 51501. During the relevant time periods to these allegations, Future Foam manufactured and/or sold polyurethane

11

foam for bedding, furniture, carpet and other applications. During time periods relevant to the allegations in this Complaint, Future Foam manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

**Scottdel**

32.     Defendant Scottdel, Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. During the relevant time periods to these allegations, Scottdel manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications. During time periods relevant to the allegations in this Complaint, Scottdel manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

**Leggett**

33.     Defendant Leggett & Platt, Inc. ("Leggett") is a Missouri corporation with its principal place of business at 1 Leggett Road, Carthage, MO 64836. During the relevant time periods to these allegations, Leggett manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications. During time periods relevant to the allegations in this Complaint, Leggett manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

**Mohawk**

12

34.     Defendant Mohawk Industries, Inc. ("Mohawk") is a Delaware corporation with its principal place of business in Calhoun, Georgia.   During the relevant time periods to these allegations, Mohawk manufactured and/or sold polyurethane foam for carpet and other applications.   During time periods relevant to the allegations in this Complaint, Mohawk manufactured and/or sold polyurethane foam in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

**<u>Vitafoam</u>**

35.     Defendant Vitafoam, Inc. ("Vitafoam USA") is a privately owned and operated company with its headquarters located at 2215 Shore Drive, High Point, North Carolina 27263. Vitafoam USA is a part of British Vita Unlimited.   During the time periods relevant to the allegations in this Complaint, Vitafoam USA directly and/or on behalf of British Vita Unlimited manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engages in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

36.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3 J 2A9, Canada.   Vitafoam Canada is a part of British Vita Unlimited.   During time periods relevant to the allegations in this Complaint, Vitafoam Canada directly and/or on behalf of British Vita Unlimited manufactured and/or directly sold polyurethane foams; Vitafoam Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Vitafoam Canada otherwise engaged in the unlawful conduct described in this

13

Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

37.     Defendant British Vita Unlimited ("Vitafoam UK") is a company organized and existing under the laws of the united Kingdom, its principal place of business is in London, United Kingdom, and its ultimate parent is Vita Cayman Limited which is located in Georgetown, Grand Cayman, Cayman Islands BWI.  Vitafoam UK controls The Vita Group, which includes among its members Vitafoam USA and Vitafoam Canada (along with companies producing polyurethane foam operating in European countries including England, France, Germany, and the Netherlands). During time periods relevant to the allegations in this Complaint, Vitafoam UK, through its domination or control over Vitafoam USA and Vitafoam Canada, manufactured and/or sold polyurethane foam to Plaintiff and/or others in the United States and/or elsewhere; Vitafoam UK was a conduit or source of information for Vitafoam USA and/or Vitafoam Canada about the conspiracy, including the production, pricing or sale of polyurethane foam in Europe and/or elsewhere; Vitafoam UK communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Vitafoam UK otherwise engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

38.     (a)     Vitafoam USA, Vitafoam Canada and Vitafoam UK were each members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

(b)     Alternatively, Vitafoam UK was a member of the conspiracy alleged in this Complaint because of, among other reasons, and upon information and belief, Vitafoam USA's and

14

Vitafoam Canada's respective status during time periods relevant to these allegations as the alter ego or agent of Vitafoam UK was evidenced by Vitafoam UK's domination or control over Vitafoam USA and/or Vitafoam Canada with respect to, among other things: (i) the prices at which Vitafoam USA and/or Vitafoam Canada sold polyurethane foam; (ii) the hiring and firing of officers or members of the board of Directors of Vitafoam USA and/or Vitafoam Canada; (iii) the budget for Vitafoam USA and/or Vitafoam Canada; (iv) the capitalization of and/or loans to Vitafoam USA and/or Vitafoam Canada; (v) the transfer of officers or employees between Vitafoam UK and Vitafoam USA and/or Vitafoam Canada; (vii) the business plan or operation of Vitafoam USA and/or Vitafoam Canada; (viii) officers or employees of Vitafoam UK communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Vitafoam USA and/or Vitafoam Canada; (ix) Vitafoam UK used Vitafoam USA and/or Vitafoam Canada as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere which Vitafoam UK used to make sure that Vitafoam USA charged Plaintiff and/or others supracompetitive prices for polyurethane foam; and/or (x) Vitafoam UK and Vitafoam USA and/or Vitafoam Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks. Vitafoam UK dominated or controlled Vitafoam USA and Vitafoam Canada with respect to conspiracy activities alleged in this Complaint.

39. Vitafoam USA, Vitafoam Canada and Vitafoam UK are individually and collectively referred to in this Complaint as "Vitafoam" or the "Vitafoam Defendants".

40. During time periods relevant to these allegations, Vitafoam manufactured and/or sold polyurethane foam for bedding, furniture, automotive and other applications.

**Woodbridge**

41.     Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a Michigan corporation with its headquarters located in Troy, Michigan.  Woodbridge S&E is part of The Woodbridge Group which itself is a member of the World Polyurethane Alliance.  During time periods relevant to the allegations in this Complaint, Woodbridge S&E, directly, through Woodbridge Foam Fabricating, Inc. and/or on behalf of Woodbridge Canada and/or The Woodbridge Group manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

42.     Defendant Woodbridge Foam Fabricating, Inc. ("Woodbridge Fabricating") is a corporation organized and existing under the laws of the State of Tennessee with its principal place of business in Chattanooga, Tennessee.  Woodbridge Fabricating is part of The Woodbridge Group.  During time periods relevant to the allegations in this Complaint, Woodbridge Fabricating, directly, through or on behalf of Woodbridge S&E, or on behalf of Woodbridge Canada or The Woodbridge Group manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

43.     Woodbridge S&E and Woodbridge Fabricating are collectively referred to in this Complaint as "Woodbridge USA").

44.     Defendant Woodbridge Foam Corporation ("Woodbridge Canada') is a Canadian corporation with its principal place of business in Mississauga, Ontario.  Woodbridge Canada is part of The Woodbridge Group, and the reference in this Complaint to "Woodbridge Canada" includes The Woodbridge Group.  Woodbridge Canada and The Woodbridge Group share the

16

same corporate headquarters. During time periods relevant to the allegations in this Complaint, Woodbridge Canada directly, on behalf of The Woodbridge Group, and/or through Woodbridge USA manufactured and/or sold polyurethane foam purchased by Plaintiff and/or others in the United States; Woodbridge Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Woodbridge Canada otherwise engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Tennessee Code §§ 47-25-101 et seq.

45. (a) Woodbridge USA and Woodbridge Canada were each members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

(b) Alternatively, Woodbridge Canada was a member of the conspiracy alleged in this Complaint because, among other reasons, upon information and belief, Woodbridge USA's status during time periods relevant to these allegations as the alter ego or agent of Woodbridge Canada as evidenced by Woodbridge Canada's domination or control over Woodbridge USA with respect to, among other things: (i) the prices at which Woodbridge USA sold polyurethane foam; (ii) the hiring and firing of officers, employees or members of the board of directors of Woodbridge USA; (iii) the budget for Woodbridge USA; (iv) the capitalization of and/or loans to Woodbridge USA; (v) the transfer of officers or employees between Woodbridge USA and Woodbridge Canada; (vi) financial benefits provided to officers or employees of Woodbridge USA; (vii) the business plan or operation of Woodbridge USA; (viii) officers or employees of Woodbridge Canada communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Woodbridge USA; (ix) Woodbridge Canada used Woodbridge USA as an

17

instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere to make sure that Woodbridge USA charged Plaintiff and/or others supracompetitive prices for polyurethane foam; and/or (x) Woodbridge Canada and Woodbridge USA had a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks. Woodbridge Canada dominated or controlled Woodbridge USA with respect to conspiracy activities alleged in this Complaint.

46.     Woodbridge USA and Woodbridge Canada are individually and collectively referred to in this Complaint as "Woodbridge" or the "Woodbridge Defendants".

47.     During time periods relevant to these allegations, Woodbridge manufactured and/or sold polyurethane foam for furniture, automotive and other applications.

48.     The corporate Defendants identified above participated in the conspiracy alleged in this Complaint by and through the actions of their respective officers, directors, employees and/or agents, each of whom was acting within the scope and course of his/her employment when engaging in conduct in furtherance of the polyurethane foam conspiracy.  Alternatively, each corporate defendant negligently failed to implement sufficient controls to detect and prevent the conduct of its officers, directors, employees and/or agents from the conduct alleged in this Complaint.

## AGENTS AND CO-CONSPIRATORS

49.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

50. Various persons and/or firms not named as Defendants herein—including at least A-Z Sponge & Foam Products Ltd. (also known as A to Z Foam), Broadway Foam & Fabric Supplies Ltd. (also known as Broadway Foam), Ottobock Polyurethane Technologies, Inc., a German corporation; Inoac Corporation, a Japanese corporation; Inoac USA, Inc., a Kentucky corporation, and Crest Foam Industries, Inc., a Delaware corporation and CMI Enterprises (also known as CMI Automotive)—may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

51. Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

FACTUAL ALLEGATIONS

I.    The Flexible Polyurethane Foam Market

52. While there are many different uses for flexible polyurethane foam, the uses generally can be grouped into three main product segments: (1) block foam, also known as commodity or slabstock foam, which is poured and then cut for use in such products as furniture cushions; (2) carpet underlay, made primarily from scrap flexible foam; and (3) engineered, or molded, foam, which is fabricated for use in, among other things, automobile products.   (By contrast, "rigid" or "technical" foam is primarily used in construction for insulation purposes.)

53. Flexible polyurethane foam is typified by open cells that make the end product soft, light, resilient and breathable.  To manufacture flexible polyurethane foam for cushioning, two basic procedures are used.  In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high. The continuous slab is then cut, stored, and allowed to cure for up to 24 hours.  This manufacturing procedure is the slabstock production process. The cured

19

foam is subsequently fabricated into useful shapes. Most foam for use in furniture and bedding is produced this way.

54.    A second method, foam molding, is a process where the same or substantially the same chemical mix is poured into specially shaped molds, allowing the foam reaction to take place. This process is used primarily for automotive cushioning, although some furniture utilizes molded cushions.

55.    In 2010, domestic revenue for the polyurethane foam industry was projected at $12 billion. Typically, flexible polyurethane foam averages between 70-85% of the total output of polyurethane foam in the United States.

56.    In 2009, flexible polyurethane foam for furniture and bedding products accounted for approximately 38% of flexible polyurethane foam sales revenue; flexible polyurethane foam for transportation products accounted for approximately 32% of flexible polyurethane foam sales revenue; flexible polyurethane foam for flooring products accounted for approximately 25% of flexible polyurethane foam sales revenue; and flexible polyurethane foam for other end uses— including but not limited to packaging and textiles— accounted for approximately 5% of flexible polyurethane foam sales revenue.

II.    The Conspiracy To Fix Prices For Polyurethane Foam

A) Evidence Of The Conspiracy To Fix Flexible Polyurethane Foam Prices

    i.    Defendant Vitafoam admits to the conspiracy

57.    Upon information and belief, in February 2010, Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division ("DOJ"), to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the flexible polyurethane foam industry and to seek acceptance into the DOJ's Corporate Leniency Program.  Since that

time, Vitafoam and its employees have been cooperating with a criminal investigation into illegal anticompetitive conduct in the flexible polyurethane foam market.

58.     Vitafoam has received a conditional leniency letter from the DOJ, which means that Vitafoam admitted to its participation in a conspiracy to violate the U.S. antitrust laws.  As a November 19, 2008 presentation available on the DOJ's website explains, "[a conditional leniency] applicant must admit its participation in a criminal antitrust violation involving price fixing…before it will receive a conditional leniency letter."

59.     In seeking conditional leniency with the DOJ and in connection with a pending Canadian government investigation of antitrust violations by manufacturers of flexible polyurethane foam, several current and former Vitafoam employees agreed to be interviewed regarding the flexible polyurethane foam price fixing conspiracy.  These interviews revealed the mechanisms, participants, duration, and impact of the conspiracy.  These employees described a cartel among Defendants, who are responsible for production of the majority of flexible polyurethane foam, and other co-conspirators.

> ii.     Vitafoam employees explain how Defendants conspired to fix prices and allocate customers

60.     Defendants established a practice where they would communicate and reach an agreement or understanding on the percentage amount and timing of price increases and market allocation in the sale and supply of polyurethane foam.  Price increase discussions occurred approximately two to three times per year and often coincided with the bi-annual meetings held by the Polyurethane Foam Association ("PFA").

61.     The general pretext used to explain the conspiratorial price increases was increases in raw material costs.  Defendants (or "foamers" as they are referred to at times in the industry) utilize chemicals, including polyols and toluene diisocyanate (or "TDI") in the manufacturing of

21

flexible polyurethane foam. When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, Defendants contacted each other because this provided an opportunity to raise prices. Defendants viewed price fixing as necessary because, if defendants did not increase their foam prices by the same percentage amount and at around the same time period, the attempted price increase would fail.

62.     The conspiracy, understanding and agreements regarding price increase percentage amounts among Defendants was the result of telephone conversations, exchanges of price increase letters, face-to-face meetings, and bilateral discussions among the competitors for the purpose of coordinating the amount and timing of price increases.

63.     During the relevant period, there was an understanding and agreement among the Defendants and their co-conspirators to collectively support supracompetitive prices. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with the same, or nearly the same, effective dates. Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators. Defendants policed these increases to ensure they were implemented by their co- conspirators, and they did not permit price reductions without consent of the overall group.

        iii.     Former Vitafoam executives

64.     A former President of Vitafoam, who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price fixing and customer allocation conspiracy alleged herein relating to flexible polyurethane foam in North America.

65.     The former President of Vitafoam together with Defendants engaged in frequent and regular unlawful communications during the relevant period where they discussed and agreed

to specific price increases and the timing of announcements regarding the effective date of those increases.

66.     Vitafoam had a purported company policy of not having conversations with competitors, but this policy was merely window-dressing and was not followed in practice during the relevant period.

67.     As part of the conduct to coordinate and/or support price increases during the relevant period, the former President of Vitafoam instructed his sales people to send copies of their draft price increase letters to other Defendants and obtain other Defendants' versions of the same. Defendants utilized these drafts to confirm their anticompetitive agreements and further implement the conspiracy.  The Defendants with whom he spoke also discussed how much each competitor wanted to raise prices, when the price increases should go into effect, and when the price increase letters should be issued.  As described below, these measures were used not only to set supracompetitive prices, but also to police the conspiracy and ensure compliance.

68.     Upon information and belief, Vitafoam personnel, including at least Steve Pendock, Gerry Hannah, David Gurley, Frank Roncadin, George Newton, Tim Prescott, and Phil Fonseca, participated in these discussions with other Defendants to share information about and reach agreement on price increases.

69.     Vitafoam's discussions relating to coordinating price increases among Defendants were conducted primarily by means of telephone, electronic mail, and in- person meetings.  In person discussions frequently took place at Polyurethane Foam Association ("PFA") meetings.

70.     The former President of Vitafoam, along with his subordinates, had conspiratorial discussions during the relevant period with other Defendants regarding fixing prices and allocating customers.  Upon information and belief, these discussions included at least Tony Dacosta, Al

Zinn, and Doug Dauphin of Foamex; Max Tenpow of Carpenter; Bruce Schneider of Future Foam; Don Coleman of Hickory Springs; and Robert Valle and Dean Brayiannis of Valle.

71.    A former Vice President of Sales and Marketing for Vitafoam who has worked in the polyurethane foam industry since 1963 participated in interviews and admitted his role in the conspiracy.  He first worked for Woodbridge, and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products.  This former Vice President worked for Vitafoam in Canada until March 2009 when he retired.  He was personally involved in a long-running price fixing and customer allocation conspiracy throughout North America along with other individuals at Vitafoam as well as at other companies.

72.    The former Vice President of Vitafoam also participated in conspiratorial conduct during the relevant period with many individuals employed by numerous competitors, including at least Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Domfoam, Scottdel, and Foamex.  The communications involved discussions of price increase percentages and effective dates of such increases, typically by telephone.  The competitors exchanged copies of price increase letters to coordinate and support these increases.  Individuals from competitors with whom the former Vice President conspired to fix prices and allocate customers included upon information and belief,  at least Stanley Pauley, Ed Malacheck, Mark Kane and Max Tenpow of Carpenter; Tony Vallecoccia, Dean Brayiannis and Robert Valle of Valle; Doug Dauphin and Tony Dacosta of Foamex; and John Howard of Domfoam.

73.    Upon information and belief, the former Vice President of Vitafoam and Mark Kane of Carpenter had discussions on multiple occasions during the relevant period involving price increases concerning a shared customer.  In an effort to coordinate their price increases and to make sure those increases went through for the mutual customer, the former Vice President and Kane called each other and exchanged copies of draft price increase letters by fax.

24

74.     Upon information and belief, Robert Valle and Tony Vallecoccia of Valle also communicated with other Defendants by telephone and faxed each other copies of their draft price increase letters that would be sent to customers in order to coordinate and collude on price increase percentages and their effective dates. They reported on these efforts to Vitafoam.

75.     Upon information and belief, Vitafoam employee David Gurley was a manager involved in scrap foam, obtained by Vitafoam for carpet underlay production.  Gurley had numerous contacts with other Defendants in furtherance of the conspiracy. As a result of these contacts, Gurley provided the former Vitafoam executives and co-employee Steve Prescott with other Defendants' draft price increase letters, competitor price lists, and other information.

76.     During the relevant period, Vitafoam employee George Newton exchanged information with Carpenter employee Max Tenpow regarding the amount and effective date of price increases.  Newton also provided this conspiratorial information to other Defendants.

77.     In addition to these unlawful agreements to fix prices, the former Vitafoam executives and Defendants agreed to avoid each other's customers and refrain from taking business or market share from one another during the relevant period.

iv.     Recent or current Vitafoam executives

78.     In addition, a former Woodbridge employee was employed in Ontario, Canada, from 1986 until 2009 and participated in the conspiracy.   While working at Defendant Woodbridge, this employee served most recently as Vice President of Commercial Sales where he had authority to determine prices.   In April 2009, this former Woodbridge employee became Vitafoam's Vice President of Sales.   In his position at Vitafoam, he had authority to determine prices.   This Vitafoam Vice President has also admitted to his role in the long-running price fixing and customer allocation conspiracy with other Defendants.

25

79.     This Vitafoam Vice President engaged in conspiratorial activity while employed by Woodbridge and Vitafoam by reaching understandings and agreements on price increases with other Defendants.  These agreements concerned both the amount and the effective date of the price increases.  The objective of the price increase coordination was for the conspirators to pass on cost increases to customers, as well as to maintain their respective market share.

80.     The Vitafoam Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least Woodbridge, Vitafoam, Foamex, Carpenter, Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam.   Co-workers at both Woodbridge and Vitafoam also participated in the scheme.

81.     Upon information and belief, an information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A," this same employee of Vitafoam, regarding conduct "in Canada and in the United States."   The information states under oath: "Witness describes himself as someone who gathers and shares information across the foam sectors.  Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Foamex | Vinnie A. Bonaddio | Senior Vice President, Technical Products Group |
| Foamex | Don Phillips | Executive Vice President, Automotive Parts Division |
| Valle Foam | Tony Vallecoccia | President |
| DomFoam International Inc. [sic] | John Howard | President |

| | | |
|---|---|---|
| Ottobock [sic] | John Vins | Sales Manager |
| Plastomer | Bill Baughman | Chief Executive Officer |
| Inoac International Co. | Mike Cotter | Marketing Manager |
| Inoac International Co. | Ken Miya | Managing Director |
| Hickory Springs | Todd Councilman | Marketing – Sales Manager |
| Flexible Foam Products | Mike Crowell | VP Sales and Marketing |
| Vita | Mel Himel | President |
| Hickory Springs | Buster Mann | VP, Eastern Division |
| CMI Automotive | Jorge Canamero | President |

Conduit of information[1]:

| Companies | Contacts | Positions |
|---|---|---|
| Bondtex Incorporated | Jerry Hightower | President |
| Cerex Fabric | Dan Holsenbeck | Sales Manager |
| Inoac USA | Max Ozeki | VP Foam Division |
| Morbern Inc | John Weaver | VP Sales and Marketing |

"

82. The sworn affidavit from Pierre-Yves Guay also separately states that it is the result

of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada

by entities including Carpenter, Valle Foam, Domfoam, A to Z Foam, Vita Foam Group, Foamex,

Flexible Foam, Future Foam, Mohawk, Scottdel,  Broadway Foam, Woodbridge, Leggett & Platt,

---

[1] "Conduit of information means that Witness A had discussions with these individuals who reported market conditions and price increases by alleged cartel members to him. These discussions were not about price fixing or market allocation but rather represented simply a transmission of information."

27

and Hickory Springs.  The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

83.     Upon information and belief, while he was employed by Woodbridge, the Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the President of Vitafoam, to discuss price increases specifically for foam applications in the automotive industry.  Bill Lucas also acted for Crest, which was controlled by Vitafoam, in these communications.

84.     When Defendants discussed price increases for foam products for the automotive industry, although price increases for automotive foam products generally involved telephone calls, rather than letters, the discussions included price increase letters for foam products. Defendants discussed price increase letters for foam products generally, even in specific communications about automotive foam products, because this helped the competitors coordinate price increases and timing of price increases for automotive foam products.

85.     Upon information and belief, the Vitafoam Vice President, while he was employed by Woodbridge, also had contacts with Vincent Bonaddio at Foamex to discuss price increases for automotive foam products.

86.     Upon information and belief, in 2004, while employed by Woodbridge, the Vitafoam Vice President attended a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest.  During the meeting, there was a discussion regarding price increases of foam. Upon information and belief, on May 26 & 27, 2010, the current Vice President attended a PFA meeting in Baltimore, MD. While there, he discussed foam pricing with Michael Crowell of Flexible Foam. Crowell asked why Vitafoam was not raising prices or following a recent increase. Another Vitafoam executive, the President, was previously the Director of Corporate Engineering at Woodbridge from 1985 until January 2008, where he had authority to determine prices.  As the President of Vitafoam, a position he held beginning in August 2008, he also had authority to

determine prices. Along with other individuals from Defendant companies, he participated in the long-running price fixing and customer allocation conspiracy.

87. Upon information and belief, discussions with competitors in the foam industry involving the current President of Vitafoam while he was at Woodbridge included conversations about topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases. These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversations.

88. Upon information and belief, the President of Vitafoam participated in conspiratorial discussions concerning pricing in the flexible polyurethane foam market with various competitors at both Woodbridge and Vitafoam, including at least Bill Lucas of Vitafoam; Donald Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann and Lee Lunsford of Hickory Springs; and, Bruce Schneider and Robert Heller of Future Foam. David Gurley also sent an email to the current President of Vitafoam in which he acknowledged receiving draft price increase letters from competitor Don Simpson of Hickory Springs. These discussions led to a clear understanding and agreement that the participants would discuss and implement coordinated price increases on the same effective dates.

89. Upon information and belief, A Vitafoam executive had several communications with Dean Brayiannis from Valle leading to an agreement on June 2009 on the promotional pricing for carpet foam for a shared customer. This agreement to offer the same promotional pricing was followed after June 2009.

90.     Specifically, each of the price increases for flexible polyurethane foam, going back to at least 1999 and until Vitafoam's entry into the leniency program, were the result of conspiratorial discussions among Defendants on pricing.

B) Defendants Implement and Enforce the Conspiracy

91.     Defendants also undertook substantial efforts to police the conspiracy. Participants, including the former Vice President of Vitafoam, followed up after discussions with other Defendants to determine if the specific agreed price increases and effective dates were implemented.  If one of the Defendants did not agree to raise prices at the same amount or in the same time period as the other Defendants, the other Defendants would pressure the hold out until it acquiesced.

92.     Furthermore, Defendants routinely exchanged and reviewed each other's price increase letters in order to confirm that their conspiratorial agreements were being implemented. When a Defendant would fail to exchange or confirm its price increase letters, the other Defendants would hound that Defendant and threaten action to engage in competitive price wars against the non-cooperating Defendant.

93.     Upon information and belief, on April 9, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam.  Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future, Foamex and Flexible intended to increase the price of foam by 20% in the next weeks.

94.     Upon information and belief, on another call, Schneider again discussed price increases by the Defendants with the President of Vitafoam. Schneider stated: "Now it's looking it's all everything is postponed to May 31st or June 1st.  There is a letter out from Carpenter for 31st of May.  This is a letter out from Flexible for June 1st.  Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam."  The Vitafoam

30

President asked: "Are you hearing anything from the other guys? Or is it just kinda market stuff?" Schneider responded: "Oh, from the other, the other people the foamers? Yeah, we are hearing 10-12… It's kinda what we hear from other people what they expect. Ya know, it would have been great to get 20% but I don't think so." The conversation concluded with a request for information from Schneider. "If you hear anything from your friends in Europe. What's going on over there, I sure would like to know that as well."

95.     Upon information and belief, on June 10, 2010, Bruce Schneider of Future Foam left a voice mail message for the current President of Vitafoam. In this message, Schneider stated, "Hi [President], this is Bruce Schneider… If you want to give me a call I've got information of why the increase changed from 10 to 12 to 9."

96.     Upon information and belief, on May 20, 2010, John Howard, President of Domfoam, called the current Vitafoam Vice President twice to voice complaints about a Vitafoam salesman, Normand Widmer, attempting to acquire Domfoam customers. During the call, Howard stated:

> "Your fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices. If he wants a battle, I'll give him a battle…These guys have been in at accounts they've never sold at…if he wants a battle, he's got one. We will start going after his accounts and it won't be pretty. We'll both end up hurting…I'm pissed off and our sales guys are pissed off and they're saying 'John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us. So. I'll let the dogs loose or I don't let the dogs loose. Want to mill it over and give me a shout back?"

The Vice President of Vitafoam responded:

"It's sort of a bad time for me right now." Howard then stated:

> "I don't expect an answer right now but, I'm leaving tomorrow night for a week. I would like to at least give the guys some indication that, 'Guys, give me another week. I think the dust is going to settle.' Or, 'Guys just do what you have to do.

31

Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell you have to do. We have to respond.' So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?"

97.    Upon information and belief, on May 25, 2010, the Vice President of Vitafoam

called Howard back. During the call, Howard stated:

"Just, you know we've kind of stayed out of each other's way for some time here while business is quiet. There's just no business to be had and dropping prices is only going to benefit the customers. I can't afford to have him take stuff away…It'll be a rough go if he wants to go and quote prices in places where he's not currently selling…Tell Normand it's a, I mean we just don't even know who your accounts are. Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts. So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on. But the buyers are asking me, you know, 'John, you're always telling us to stay away.' We do the same thing with Foamex, we don't go after their accounts. Haven't for a while business has been in the shitter. Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable. There ain't much business out there and dropping prices and only the customers are going to benefit. But let him make his decision and if it's to continue going after them then tell him there'll be some consequences. That's it. I'm not gonna, no threats but I can't not do anything. The sales guys are getting kind of…'Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there.' You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them 'Guys, just go and do what you got to do.'…Keep an eye on this guy, it's ah, he needs coaching, there you go."

98.    Upon information and belief, on May 25, 2010, Howard also left a voicemail

message for the Vice President of Vitafoam:

"Hi, it's John…we never really did resolve anything, I guess I did most of the talking…where do we leave this thing , vis-à-vis going after each other's accounts. I'd be quite happy just to let it settle right here and not do anything more. But if [the President of Vitafoam] got some real pressure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off. So, give it some thought and maybe over the next day or two, just give me a shout and let me know. I understand you can't override [President of Vitafoam], but I can't just hold our guys at bay and tell them, 'Well, don't do anything guys,' That's not a winning strategy for us either. So, give me a call in the next day or two would you? And let me know what course of action Widmer's going to take here."

32

99.     Upon information and belief, on June 2, 2010, two executives of Vitafoam spoke concerning a price increase announcement.  One of the Vitafoam executives explained it was important to talk to Raj Mehta of CrestFoam about the price increase announcement.

100.     Upon information and belief, on June 4, 2010, Tim Prescott of Vitafoam left a voice mail message for Vitafoam's Vice President:

> "Hey, it's Tim…Can you give me a call when you get a chance.  I don't know whether you've spoken to [President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the increase and he just called me again asking can VPS please call John Howard over at Domfoam."

101.     Upon information and belief, on June 3, 2010, Dean Brayiannis of Valle called Steve Prescott of Vitafoam:

Brayiannis:     "I sent you a text regarding price increase letters.  I'm assuming you've got most of the ones that you wanted to see."

Prescott:     "I didn't see, I had the old boy had faxed me one from a couple of days ago…Yah, okay, no problem,  Yah, I guess, like that's, you know, it's game on again, isn't it."

Brayiannis:     "Ah, we'll see what happens.  I've got Carpenter, Flexible, Mohawk, Leggett."

Prescott:     "But it's warranted, you know what I mean.  Like, we know the prices of raw material have been going up, so ah."

Brayiannis:     "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do."

33

Prescott:        "Yah, yah.  Well, yah, like I say it's it's game on. So I would imagine that most manufacturers will move forward with it. We will have to see whether they, whether they do or not and see how that goes."

Brayiannis:      "Yah, yah.  Alright. Well our letter is out so hopefully I'm assuming you've probably put something out by now."

Prescott:        "It's as good as done."

Brayiannis:      "Okay.  Well we're already out, so we've already put our letter out."

102.    Upon information and belief, on June 9, 2010, Brayiannis called Prescott twice, leaving a voice mail message first, then called again to further discuss the price increase.

Brayiannis:      "Still haven't seen or heard of your increase letter yet."

Prescott:        "Well, have a look around."

Brayiannis:      "I have.  Haven't found anything yet…I've still got one guy telling me that you haven't issued a letter.  So have you issued?  Yes or no?"

Prescott:        "People will lie to you, Dean."

Brayiannis:      "Are you around the same time frame as us?  July 5th or what?"

Prescott:        "Ah, yah, close."

Brayiannis:      "Okay.  And you haven't seen what, sorry?  You haven't seen other increase letters or did you get all of those?"

Prescott:        "Well, I know, I know that, know Stan, Stan said that he'd seen the Mohawk one and…I guess one of the other U.S. guys.  You know, everyone waits for the leader and

once the leader goes out then everyone else follows cause we all know that the prices of material have gone up so, you know what I mean?"

Brayiannis:    "Well at the end of the day over the last two increases we have chatted about it so just wanna make sure you got your letter out."

Prescott:    "Yah.  Okay pal."

103.    Upon information and belief, on May 25, 2010, Vitafoam received a call from Michel Legendre of Carpenter, who informed Vitafoam that Carpenter would be raising its prices on June 28, 2010.  Six days later, on May 31, 2010, Legendre again called Vitafoam and told them that Carpenter would be raising prices by 11%. The following day, Carpenter provided Vitafoam with a copy of the letter it sent to its customers, which included the dates and amounts of the price increases.

104.    Upon information and belief, after Vitafoam raised its own prices, Legendre once again contacted the company, this time on June 15, 2010. He spoke with the Vitafoam Vice President and asked whether Vitafoam was "ready for round 2?"  Legendre informed the Vice President that Carpenter was preparing to send a letter the following day with a 12% price increase, effective July 19, 2010.  He also confirmed that manufacturers in "the States were similarly raising prices."

105.    Upon information and belief, once the two men finished discussing the details of the second price increase, they then turned to a discussion of whether they should be speaking at all:

Legendre:    "Hey let me ask you something.  That new boss of yours, you've got a guy there apparently I heard doesn't want us to communicate.  Is that correct?"

Vitafoam:    "Ahhh…yah, that's that's true.  That's ahh very true actually."

35

Legendre:      "Mine…[As you know] mine are the same right."

Vitafoam:      "Oh I understand."

Legendre:      "But I heard that jeez, the same thing I guess this guy you've got, I forget his name now, said the same thing he doesn't want nobody to talk and I'm like holy [expletive] ok here we go."

Vitafoam:      "Yah.  Well, you know, that's, that's, that's, that's policy so…"

Legendre:      "Yah"

Vitafoam:      "That's…it's corporate stuff right."

…

Legendre:      "Ok. You know, I'm actually waiting for a third one [price increase].  I think it is going to be a repeat of, what is it, last year or the year before, I don't know."

Vitafoam:      "It was about three years ago.  We didn't go up enough last year.  The prices have been, the prices have been pretty low for a bit."

Legendre:      "Yah, you know what they've actually been too low really."

Vitafoam:      "Sorry?"

Legendre:      "They've actually been too low."

36

106. Upon information and belief, on May 27, 2010, Lee Lunsford of Hickory Springs called the Vitafoam President and inquired whether Vitafoam was raising prices. When the Vitafoam President expressed hesitation about doing so, Lunsford noted that there was "no volume anywhere" and "there is twice as much capacity as demand."

107. Upon information and belief, on June 3, 2010, Lunsford again called Vitafoam, this time speaking with the current Vitafoam Vice President. In their conversation, the Vice President informed Lunsford that Vitafoam was raising its prices at the end of the month. Lunsford inquired how much and, when told it would be by approximately 12%, agreed that this was an acceptable number to Hickory Springs.

108. Upon information and belief, the Defendants also exchanged emails in furtherance of the conspiracy to fix prices for flexible polyurethane foam:

    a. In June of 2000, the Vitafoam Vice President – who was an employee at Woodbridge at the time – sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex to which the salesperson responded "Yes, we told him we are going out with our letters 12% effective July 30th; he said we would follow."

    b. During October and November 2004, the Vitafoam Vice President reported to his supervisor at Woodbridge by email that he had discussions with Bill Lucas, acting for Vitafoam and Crest, which resulted in an agreement for a foam price increase effective January 1, 2005.

    c. On October 21, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge where he said: "Lucas and I are talking about our favorite subject. Jan. 1 as

a possible date." This email concerned a price increase discussion for foam for the automotive sector with an effective date of January 1, 2005.

d. On November 2, 2004, the Vitafoam Vice President sent an email to his supervisor at Woodbridge and other superiors at Woodbridge saying that he "Met with Lucas at PFA" and that Lucas was "most interested in their auto increases. They will announce for Jan. 1. They would go +20%."

e. On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge with the subject header "Spoke to Lucas." The email stated "They are going to market probably next week. Looking for a Jan. 1 effective date. Were going at 18%. I said we would most likely be closer to 15%." He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

f. On March 9, 2005, the Vitafoam Vice President sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas, representing Vitafoam and Crest. "Spoke with Lucas again last week. We are trying to meeting in Chattanooga." He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls. Said that they were successful at the mills, in Furniture – they were still one [price increase] behind." The email continued: "I let him know we were going March 15th in Detroit [automotive sector]. He said they would probably wait until May 1. Would have liked a more coordinated push."

g. On May 5, 2005, the Vitafoam Vice President while he an employee at Woodbridge emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005. This relationship between Woodbridge, Crest, and Vitafoam continued for years. In a June 2, 2010 conversation between the Vitafoam Vice President and the current President, they discussed Mr. Mehta again and information to pass to him in furtherance of the conspiracy.

h. On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto." He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

i. On May 22, 2008, Nikki Walborn at Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter. (Within a year of this email, Jeff Carter went from Scottdel to Future Foam in Texas.) On May 29, 2008, Jeff Carter forwarded this email and price increase letter to David Gurley at Vitafoam, and Gurley then forwarded the email and price increase letter to his superior at Vitafoam, the current President.

j. On July 7, 2008, Jeff Carter, while still at Scottdel, forwarded via email a draft price increase letter to David Gurley of Vitafoam, stating, "David, Here is a copy of our next

39

increase letter.  Jeff."  Gurley forwarded this email and draft increase letter to the company President.  The President forwarded this string of emails and draft increase letter to his subordinates at Vitafoam, the Vice President of Sales & Marketing, and Steve Prescott.

.

k.  On July 9, 2008, Steve Prescott forwarded the email string and letter to Stan Miller of Vitafoam, with the message, "Hey pal you thought the first one was tough! Check with your Carpenter contact to see when they plan on pulling the trigger."

l.  On July 11, 2008, Stan Miller reported back to Prescott via email, stating:

"Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other then the EOR orders from the show. He said they went up the full 12% in Vancouver and they have gotten some for the business back.  He had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up. I just talked to Randy from Shnier and he said from the pricing his sales people have found that Mohawk has not gone up. Carmine has been after him for copies of their pricing but he can't get his hands on it. He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now."  Prescott asked in an email to Miller "Will Ben share info?"  Miller shortly thereafter on the same day responds to Prescott via email, stating, "Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08."

m.  On May 21, 2009, Steve Prescott of Vitafoam sent draft price increase letters to other Vitafoam employees.  One of the recipients, David Gurley of Vitafoam, forwarded those price increase letters to Jeff Carter of Future Foam in Texas.  Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating: "Louie and David, You probably have seen all these.  It's crazy out there again, personally I don't think this is enough of an increase."

40

n. Letters announcing a May 2009 increase from Flexible Foam dated April 7, 2009, from Mohawk dated April 10, 2009, from Carpenter dated April 13, 2009, from Vita Canada dated April 14, 2009, from Leggett & Platt dated April 15, 2009, and Future Foam dated April 16, 2009 were all present in Vitafoam files. Following that price increase, there was another price increase in June 2009. Price increase letters from Mohawk, Flexible Foam, Carpenter and Future Foam all dated May 18, 2009, and from Leggett & Platt and Vita Canada dated May 19, 2009 were also present in Vitafoam files.

o. Louie Carson responded to Carter thanking Carter for the information. Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoam. Gurley forwarded the string to his superiors at Vitafoam, the Vice President of Sales & Marketing and President, with the message: "Please keep this confidential and read from the bottom up. It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley. Louie Carson is one of the owners of Scottdel."

C. Defendants Kept the Conspiracy Secret

109. As described in this Complaint, the Vitafoam employees discussed herein and other participants in the conspiracy took numerous steps to avoid detection of their conspiracy. At times, full names would not be used in correspondence and instead participants would only use first names or initials.

110. Conspirators took advantage of attending trade association meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings. During the relevant period, representatives of Defendants regularly met through such organizations as the PFA, International Sleep Products Association ("ISPA"), and Surfaces, a trade group that includes polyurethane carpet underlay producers.

41

111. Representatives of Defendants claimed these trade association meetings were nothing more than "meet-and-greet" sessions with their competitors.

112. Representatives of Defendants disguised their attendance at these events as information gathering, but in fact used them as an opportunity to fix prices and divvy up their customers.

113. Representatives of Defendants had no genuine intention of learning about the market at these meetings. Defendants essentially controlled the market, and attended these meetings to further ensure and perpetuate their control.

114. Defendants also visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases. Defendants' employees also would avoid detection by communicating through fax machines at a local Staples or other store, so that the identification of the sender would be hidden on the fax transmittal.

B.        Market Factors Support The Existence Of The Conspiracy

115. Various market factors made the market for flexible polyurethane foam highly susceptible to anticompetitive practices and unlawful collusion, which allowed Defendants to implement their anticompetitive conspiracy.

i.        Limited competition

116. As a result of flexible polyurethane foam's manufacturing and product characteristics, importation into the United States from outside North America is neither practical nor economical. Consequently, the vast majority of flexible polyurethane foam sold in the United States comes from North America or a company with a United States-based subsidiary.

42

Defendants, all of whom are based in the North America or have United States based subsidiaries or affiliates, collectively represent the majority of flexible polyurethane foam manufacturers.

117.    In addition, the industry has been consolidating rather than attracting new entrants. Major players within this industry have been active in acquiring smaller companies and other competitors over the course of the last ten years. For example:

    a.  In 2007, Defendant Carpenter acquired its European competitor Dumo NV.

    b.  In 2006, following the purchase of its parent corporation, Defendant Vitafoam, Inc. sold one of its plants to Olympic Products LLC (a joint venture between Woodbridge and Hickory Springs), and sold another plant to Flexible Foam Products.

ii.      Inelastic demand due to lack of substitutes

118.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in little or no decline in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

119.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

120.    Demand for flexible polyurethane foam is relatively inelastic.  In furniture and bedding applications, for example, short staple polyester fiber and cotton can be used instead of flexible polyurethane foam, but both alternative materials have poor height recovery characteristics after compression and are therefore inferior to flexible polyurethane foam.  Steel springs recover well but must be insulated from the user with some type of cushioning material (i.e. polyurethane

43

     iii.  Standardized commodity product with high degree of interchangeability

  121. A "commodity product" is characterized as a product that is readily interchangeable and for which competition is primarily driven by price rather than other market pressures, such as branding and marketing. The mass production and interchangeability of commodity products results not only in pressure for competitors to enter into conspiracies to fix and maintain prices, but serves as a mechanism to successfully adopt and implement such conspiracies.

  122. Flexible polyurethane foam is a commodity used in hundreds of consumer products to provide comfort, support, safety and durability. Flexible polyurethane foam is interchangeable across manufacturers. The last major technological breakthroughs in the production of flexible polyurethane foam occurred in the mid-20th century, and flexible polyurethane foam is now classified as a commodity chemical product.

  123. Accordingly, each Defendant has the capability to produce the same or similar flexible polyurethane foam products, and flexible polyurethane foam customers make purchase decisions based principally on price. This commoditization and interchangeability of flexible polyurethane foam facilitated Defendants' conspiracy by making coordination on price much simpler than if Defendants had numerous distinct products with varying features.

     iv.  Opportunities to conspire

  124. Defendants are members of trade associations, including the PFA, ISPA, Alliance of Flexible Polyurethane Foam, Carpet Cushion Council, and Surfaces. The PFA is one of the largest such trade associations, and approximately 70% of U.S. polyurethane foam manufacturers are PFA members.

125.    As discussed above, during trade association meetings—including PFA meetings—Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

ACCRUAL OF CLAIM, CONTINUING VIOLATION,
EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

126.    Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to disclosure in 2010 of the raids by government agencies of certain Defendants' facilities.

127.    Since the start of their conspiracy, Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff. These violations each constituted injurious acts.

128.    In addition, Defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiff was unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for flexible polyurethane foam in the United States.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

129.    Plaintiff did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

130.    Neither Defendants nor their co-conspirators told Plaintiff that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, the conspiracy by Defendants and their co-conspirators was inherently self-concealing.

45

131.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed:

a.    By meeting secretly (including use of private telephonic and electronic communications) to discuss prices, customers, and markets of flexible polyurethane foam in the United States and elsewhere;

b.    By agreeing among themselves at meeting and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their alleged scheme;

c.    By holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

d.    By disguising price-fixing meetings and communications as technical and operational meetings, or by sending communications in a manner designed to hide the origin or source of the communication, as detailed above.

## ANTITRUST INJURY

132.     The unlawful contract, combination and/or conspiracy alleged above had and is having, inter alia, the following effects:

a.    Prices charged by Defendants and their co-conspirators to Plaintiff for flexible polyurethane foam have been maintained at artificially high and supracompetitive levels;

b.    Plaintiff has been required to pay more for flexible polyurethane foam than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c.    Plaintiff has been deprived of the benefits of free, open, and unrestricted competition in the market for flexible polyurethane foam.

46

133.     During and throughout the period of the contract, combination, or conspiracy alleged above, Plaintiff directly and indirectly purchased flexible polyurethane foam in the United States.

134.     Plaintiff paid more for the flexible polyurethane foam than it would have paid under conditions of free and open competition.

135.     As a direct and proximate result of the illegal combination, contract, or conspiracy alleged above, Plaintiff was injured and financially damaged in their businesses and property, in amounts to be determined at trial

136.     Plaintiff suffered the type of antitrust injury that both the federal laws and Tennessee Code §§ 47-25-101 et seq. were meant to punish and prevent.


INTERSTATE AND INTRASTATE TRADE AND COMMERCE

137.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, and intrastate trade and commerce within the State of Tennessee in that, inter alia:

a.  Defendants and their co-conspirators have sold flexible polyurethane foam throughout the United States;

b.  Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell flexible polyurethane foam throughout the United States;

c.  In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail;

d. The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce;

e. Certain defendants, namely Hickory Springs and Carpenter, have also engaged in the sale of over $60 million dollars of price fixed goods or over 60% of Plaintiffs' purchases of price fixed goods during the relevant period with the transactions wholly occurring within the State of Tennessee; and

f. Upon information and belief, Certain defendants, namely Hickory Springs and Carpenter, sold hundreds of millions of dollars of similarly price fixed goods throughout the state of Tennessee significantly impacting the manufacturing costs of products within the state of Tennessee as well as the end price for consumers. As such, the conduct of defendants caused a substantially effect on intrastate commerce.

CLAIMS FOR RELIEF

I. For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

138. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

139. Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1999 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

140. In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, inter alia:

48

a.  Agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of flexible polyurethane foam sold in the United States;

b.  Participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for flexible polyurethane foam;

c.  Agreeing to allocate customers;

d.  Meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

e.  Refraining from competing by refusing to offer flexible polyurethane foam at prices below the agreed-upon price.

141.    The combination and conspiracy alleged herein has had the following effects, among others:

a.  Price competition in the sale of flexible polyurethane foam has been restrained, suppressed, and/or eliminated;

b.  Prices for flexible polyurethane foam sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels; and

c.  Plaintiff has been deprived of the benefits of free and open competition.

142.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of flexible polyurethane foam.

143.    As a direct and proximate result of Defendants' illegal agreement, contract, combination trust, and/or conspiracy, Plaintiff has been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

49

144.     The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

II.     For Violation of Tennessee Code Ann. §§ 47-25-101 et seq.

145.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

146.     Defendants have entered into agreements in restraint of trade in violation of Tennessee Code §§ 47-25-101 et seq.

147.     As a result of Defendants actions in violation of Tennessee Code §§ 47-25-101 et seq.   Plaintiff is entitled to recover damages from the Defendants under said statute for its purchases of polyurethane foam.

PETITION FOR RELIEF

WHEREFORE, Plaintiff petitions that:

A.     That the Defendants be adjudged to have entered into agreements in restraint of trade in violation of Tennessee Code §§ 47-25-101 et seq. and entitled to the measure of damages under said statutes.

B.     The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.     Judgment be entered for Plaintiff against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff as allowed by law, together with the costs of the action, including reasonable attorneys' fees, and pre- and post-judgment interest.

50

D. Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

1. Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

2. Communicating or causing to be communicated to any other person engaged in manufacture, distribution or sale of polyurethane foam except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E. Plaintiff has such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: June 18, 2013.

Respectfully Submitted,
WILLIAM G. COLVIN PLLC

BY: /s/ William G. Colvin, Esq.
William G. Colvin, Esq. (BPR No. 006733)
William G. Colvin, PLLC
801 Broad Street
Suite 428
Chattanooga, TN 37402
Phone: (423) 265-8804
Fax: (423) 267-5915
Email: bcolvin@cavett-abbott.com